# EXHIBIT #2
# MASTER SUBCONTRACTOR AGREEMENT

# CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

**THIS CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT** (this "Agreement") is effective the  8th day of  August, 2021 ("Effective Date"), Smart Communication Systems (the "Recipient") having a place of business at  6417 Grenada Island Ave, Apollo Beach, FL 33572 and Tennessee Technical Services, LLC having an address of 74 Pine Lake Rd Summertown, TN 38483  ("Disclosing Party").  Disclosing Party and Recipient may be referred to herein individually as a "Party" and collectively as the "Parties".

**WHEREAS**, the Parties contemplate entering into discussions to explore a potential business relationship and potential business transactions (collectively, the "Business Relationship"); and

**WHEREAS**, Disclosing Party is willing to provide confidential and proprietary information to Recipient to assist Recipient in its consideration and evaluation of, and performance of its obligations under, the Business Relationship.

**NOW, THEREFORE**, in consideration of the premises hereof and the promises set forth below, the Parties agree as follows:

1.    Confidential Information.  For the purposes of this Agreement, the term "Confidential Information" means and includes information provided by Disclosing Party or its Representatives (as defined below) to Recipient or its Representatives in connection with the Business Relationship, including, without limitation, any trade secrets and other business, commercial, technical (such as any apparatus, drawings, designs and other specifications), marketing, pricing, financial or other information, including, without limitation, whether in electronic, oral or written form.  Notwithstanding anything otherwise contained herein, Confidential Information shall not include information that (a) is or becomes publicly available other than as a result of a breach of this Agreement by Recipient or any of its Representatives, (b) becomes available to Recipient from a source that is not known by Recipient to be in breach of an obligation to keep such information confidential, (c) was in Recipient's possession on a non-confidential basis prior to disclosure of the same by Disclosing Party, (d) is independently developed by Recipient  or its Representatives without use of or reliance on the Confidential Information or (e) becomes approved for release in writing by Disclosing Party.  With respect to a particular Party, the term "Representatives" means and includes such Party's affiliates and such Party's and affiliates' respective directors, officers, members, managers, employees, representatives (including, without limitation, financial advisors, legal counsel, contractors, consultants and accountants) and agents.

2.    Non-Use; Protection and Dissemination of Confidential Information.  Recipient agrees not to use the Confidential Information for any purpose other than the Business Relationship.  Except to the extent required by law, regulation or rule (including stock exchange or other regulatory or self-regulatory body) or as otherwise provided herein, Recipient shall not, without the prior written consent of Disclosing Party, disclose the Confidential Information to any other party and will protect the confidentiality of such Confidential Information using the same standard of care that it accords its own proprietary and confidential information, but in no event less than a reasonable standard of care; *provided, however*, that Recipient may furnish Confidential Information to those Representatives who need to have access to such Confidential Information for purposes of the Business Relationship.  As a condition to such disclosure, Recipient shall inform its Representatives of the confidential nature of the information.  If an act of a Recipient's Representative would constitute a breach of this Agreement if it had been performed by the Recipient, then that act shall constitute a breach of this Agreement by Recipient.  Recipient agrees to take all appropriate actions as reasonably necessary to enforce the obligations of this Agreement with respect to its Representatives.

3.    Non-Disclosure of Business Relationship.  In addition to the foregoing disclosure and use restrictions regarding Confidential Information, each Party agrees that, without the other Party's prior

written consent and except to the extent as required by applicable law, regulation or national stock exchange rule, it will keep strictly confidential and will not, without the prior written consent of the other Party, disclose or confirm to any third party (other than Representatives who need to know for purpose of the Business Relationship) the contents, substance, status or existence of any discussions that are taking or have taken place related to the Business Relationship (including the existence and contents of this Agreement and the fact that Confidential Information has been made available to Recipient).

4.    Required Disclosure.   If Recipient or any of its Representatives is required by any interrogatories, requests for information or documents, subpoena, civil investigation, order, decree, demand or similar legal or administrative process of any court, governmental or regulatory authority to disclose any Confidential Information, then (a) Recipient shall promptly notify Disclosing Party of such requirement (other than where prohibited by applicable law or where such disclosure is required as a result of an examination by a regulatory or governmental agency that is required to keep such information confidential) so that Disclosing Party may seek an appropriate protective order or other relief or waive compliance with the provisions of this Agreement, (b) if Disclosing Party is not able to timely obtain a protective order or other relief or if the Disclosing Party waives such compliance, Recipient or its Representative may disclose such Confidential Information, but only that portion which is required to be disclosed, and (c) Recipient will reasonably cooperate with Disclosing Party to request confidential treatment of such Confidential Information.

5.    Ownership and Nature of Confidential Information.   All Confidential Information and the rights thereto shall be and remain the exclusive property of Disclosing Party, and no right or license is granted to Recipient with respect to any Confidential Information by virtue of this Agreement or any disclosure of Confidential Information hereunder.  Except for any representations or warranties set forth in a final, definitive agreement regarding the Business Relationship, no representation or warranty is made by Disclosing Party or any of its Representatives as to the accuracy or completeness of any Confidential Information provided to Recipient hereunder or its suitability for Recipient's use, and neither Disclosing Party nor any of its Representatives shall have any liability to the Recipient as a result of the use of such Confidential Information.  Each Party acknowledges and agrees that nothing in this Agreement shall obligate either Party to disclose any information to the other Party or prohibit or restrict the right of the other Party to use any ideas, concepts, methods, expressions, know-how or techniques related to the scope of such Party's services or products and used or to be used in the course of its services or as part of its products, that are not unique to the Confidential Information.  Either Party may develop, use or market products or services similar to or competitive with the products or services to which the Confidential Information relates so long as it does not thereby breach this Agreement.

6.    Return and Destruction of Confidential Information.   Upon the written request by Disclosing Party, Recipient agrees to, at its option, either return to Disclosing Party or destroy all Confidential Information in its possession, including all copies of the same and all notes, analyses, compilations, studies or other documents prepared by, for or on behalf of Recipient or its Representatives that contain, reflect or are developed from such information, except for any such Confidential Information that exists only as part of regularly generated electronic backup data, the destruction of which is not reasonably practicable; *provided, however,* that Recipient and its Representatives may retain one copy of such material to the extent necessary to comply with applicable law, regulation or bona fide document retention policies.  Any electronic backup data and other copy of Confidential Information retained by Recipient pursuant to the preceding sentence shall remain subject to all restrictions and obligations contained in this Agreement.  Upon written request by Disclosing Party, the fact of any such destruction shall be certified in writing by Recipient to Disclosing Party.

7.    Business Relationship. Each Party acknowledges and agrees that unless and until a final, written definitive agreement regarding the Business Relationship between the Parties has been executed

and delivered, neither Party is under a commitment to enter into any agreement, discussions or negotiations with the other Party or to conclude or further pursue or proceed with such the Business Relationship or any other type of business relationship by virtue of this Agreement or any disclosure of Confidential Information hereunder, and neither Party will be under any legal obligation of any kind whatsoever with respect to such Business Relationship, except for the matters specifically agreed to herein. Neither this Agreement nor any disclosure of Confidential Information hereunder creates any agency, joint venture or partner relationship between the Parties or, except as otherwise expressly provided herein, prohibits or restricts either Party from entering into any business relationship with any third party.

8.   Remedies. Each Party acknowledges that, due to the unique nature of the Confidential Information, remedies at law would be inadequate to protect either Party against any actual or threatened breach of this Agreement by the other Party or its Representatives and that any such actual breach would cause irreparable harm that could not be adequately compensated with monetary damages. Therefore, each Party is entitled to injunctive or other preliminary or equitable relief without proof of actual damages or posting of any bond or other security in the event of any breach or threatened breach of this Agreement by the other Party or its Representatives. Such remedies shall not be deemed exclusive remedies for any such breach, but shall be in addition to and without prejudice to any other rights or remedies otherwise available to either Party at law or in equity. If any action or proceeding is brought to enforce or interpret this Agreement (whether at law or in equity) before a court of competent jurisdiction, the prevailing Party will be entitled to recover from the non-prevailing Party any costs and expenses (including reasonable attorneys' fees) incurred by the prevailing Party in connection with such action or proceeding and enforcing any judgment or order obtained therefrom and to pursue the recovery of all damages, losses and liabilities related thereto. Any trade secrets of the Disclosing Party shall also be entitled to all of the protections and benefits under applicable trade secret law and any other applicable law. If any information which is deemed by the Disclosing Party to be a trade secret is found by a court of competent jurisdiction not to be a trade secret or had been a trade secret but has lost the status as a trade secret under applicable law, then such information will be considered Confidential Information for purposes of this Agreement.

9.   Term. Unless sooner terminated in a writing mutually signed by the Parties, this Agreement will remain in effect for a period of three (3) years from the Effective Date hereof; *provided, however*, that, with respect to any Confidential Information disclosed prior to such termination date, the obligations hereunder with respect to such Confidential Information will survive such termination.

10.   Securities Laws. Each Party understands, and will communicate to its employees and authorized representatives who have knowledge of the Business Relationship, that applicable securities laws restrict the purchase or sale of securities by any person who is in possession of material, nonpublic information from the issuer of such securities and on the communication of such information to any other person when it is reasonably foreseeable that such other person is likely to purchase or sell such securities in reliance upon such information.

11.   Export Restrictions. Disclosing Party's Confidential Information is subject to all applicable export and import control and customs laws and regulations of the United States, including any associated embargo and sanction regulations, and Recipient agrees that it will not, directly or indirectly, export or re-export such information or any product, equipment or material embodying or made by use of such information to any prohibited destination or country (including the release to nationals of any prohibited country regardless of where such nationals are located) in violation of such laws and regulations.

12.   No Waiver. No failure or delay by either Party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise or waiver thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege whatsoever hereunder.

13.     Waiver; Amendment.  Neither this Section nor any other provision in this Agreement can be waived or amended except by written consent of the Parties, which consent shall specifically refer to this Section (or such other provision) and explicitly make such waiver or amendment.

14.     Assignment.  This Agreement may not be assigned by either Party without the prior written consent of the other Party.  This Agreement will inure to the benefit of and be binding upon the parties and their respective successors and permitted assigns.

15.     Costs and Expenses.  Each Party agrees that it shall be solely responsible for all costs and expenses incurred by such Party or its Representatives in connection with this Agreement and its review of the Confidential Information and evaluation of the Business Relationship.

16.     Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall to the extent permitted by applicable law, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

17.     Entire Agreement.  This Agreement contains the entire understanding and agreement between the Parties with respect to the matters set forth herein and supersedes any and all prior and contemporaneous agreements and understandings, whether written or oral, relating thereto.

18.     Notice.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such notices, requests, consents, claims, demands, waivers and other communications must be sent to the respective parties as follows:

(i)     If to Recipient:

Smart Communication Systems, LLC
6417 Grenada Island Ave
Apollo Beach, FL 33572

Attention: Lindsey Claypool
Email: lindsey@smartcommsys.com

(ii)    If to Disclosing Party:

Tennessee Technical Services, LLC
74 Pine Lake Rd
Summertown, TN 38483
Attention: General Counsel
E-Mail: ruddle.tts@hotmail.com

or at such other address as either Party may from time to time designate for itself by written notice to the other Party.

19.     Governing Law.  This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without regard to its conflict of law rules and principles, and any conflict herein shall be subject to adjudication in the courts of Harris County, Texas or where applicable, the Federal Courts of such similar jurisdiction.

20.     Construction.  Section headings herein are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  The Parties have participated jointly in the negotiation and drafting of this Agreement and shall not be construed otherwise.

21.     Counterparts; Signatures.  This Agreement may be executed in two counterparts, each of which shall constitute an original and all of which together shall constitute one and the same instrument.  It will not be necessary in making proof of this Agreement or the terms of this Agreement to produce or account for more than one such counterpart.  Each Party agrees that it will be bound by its own facsimile or scanned signature and that it accepts the facsimile or scanned signature of the other Party to this Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the Effective Date.

Smart Communication Systems, LLC                    TTS, LLC

By: *Pavel Pop-Buia*                                By: _____
Name:  Pavel Pop-Buia                               Name:
Title:  President                                   Title:

Page 5 of 5



# Tennessee Technical Services, LLC

**74 Pine Lake Rd Summertown, TN 38483--- 931-722-0529**

*This section to be completed by TTS, LLC*

| Vendor requested by: | Company #: | Vendor Type | Vendor ID #: |
|---|---|---|---|
| | | | |

## VENDOR ADD REQUEST FORM

*Please return this completed form to TTS, LLC by email to ruddle.tts@hotmail.com*

### ***Completed W9 form must accompany this request***

| | |
|---|---|
| Vendor Name: | Smart Communication Systems, LLC |
| Name of Parent Company: | 26-1332236 |
| Federal Tax ID or SS#: | |
| Remit Address: | lindsey@smartcommsys.com |
| Address Line 1: | 6417 Grenada Island Ave |
| Address Line 2: | Apollo Beach, FL 33572 |
| City, St, Zip: | 813-325-3267 |
| Phone #: | |
| Fax #: | |
| Accounts Receivable Contact: | Lindsey Claypool |
| Name: | |
| Phone #: | 218-368-8099 |
| Fax #: | |
| Email Address: | lindsey@smartcommsys.com |
| Payment Terms: | Net 30 |

**Is your company DBE or SBE certified?** ☐ YES ☑ NO    *If yes, please complete page 2 and provide certification*

| | |
|---|---|
| ForForm Completed By:: | Lindsey Claypool |
| Title: | Controller |
| Email Address: | lindsey@smartcommsys.com |

---

**PO# <u>required</u> with all invoices.** Invoices received without a PO will not be processed for payment.

---

### To ensure timely payment of your invoices, please send all invoices to:

### ruddle.tts@hotmail.com

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| | | |
|---|---|---|
| Insurance Agent<br>Address<br>City/State/Zip Code | CONTACT NAME: | |
| | PHONE (A/C, No, Ext): | FAX (A/C, No): |
| | E-MAIL ADDRESS: | |

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A : | |
| INSURER B : | |
| INSURER C : | |
| INSURER D : | |
| INSURER E : | |
| INSURER F : | |

ELECT-B

Insured Company Name
Address
City/State/Zip Code

## COVERAGES          CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | X | X | | | | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE  X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | ☐ POLICY ☐ PRO-JECT X LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | ☐ OTHER: | | | | | | | $ |
| B | AUTOMOBILE LIABILITY | X | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | X ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS ONLY X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | Comp/Coll De $1000/$5000 | | | | | | | $ |
| B | UMBRELLA LIAB ☐ OCCUR | | | | | | EACH OCCURRENCE | $ 2,000,000 |
| | X EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 2,000,000 |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| C | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | X | | | | X PER STATUTE ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| D | | | | | | | | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Tennessee Technical Services, LLC<br>74 Pine Lake Rd<br>Summertown, TN 38483 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

This MASTER SUBCONTRACTOR AGREEMENT is entered into this <u>January 1, 2021</u> by and between Tennessee Technical Services, LLC 74 Pine Lake Rd Summertown, TN 38483 hereinafter referred to as **Contractor**, and
<u>Smart Communication Systems, LLC</u>,
hereinafter referred to as **Subcontractor**. This agreement shall govern the relationship between the Contractor and Subcontractor for work during the 2021 calendar year and until all work is complete or this agreement is replaced with another agreement executed by the subcontractor.

The parties agree and bind themselves, their heirs, successors and assigns as follows:

## Article 1 – SUBCONTRACT DOCUMENTS

The terms, conditions, specifications, drawings, schedules and contract documents forming a part of the Primary Contract are hereby made a part of this subcontract by reference as fully as if set out in detail. Subcontractor shall be bound by each and every covenant, obligation and provision of Primary Contract.  In the event of any conflict between the terms of this Subcontract, or between any other terms of any of the Subcontract Documents, then the term that is the more stringent and imposes the greater obligation on the Subcontractor shall govern, control and take precedence.

## Article 2 – PERFORMANCE

Subcontractor agrees to perform the work specified and to furnish all necessary labor, miscellaneous or incidental materials, equipment, supplies and other items therefore and to promptly pay for all of such, for which Contractor may be held liable, and to complete the work in strict compliance with the terms of the Prime Contract at the direction of the Contractor and to the satisfaction of the Owner or Owner's Representative.

All subcontract work shall be guaranteed for a period of one (1) year after the Owner's acceptance of the project.

## Article 3 – THE WORK

A completed Subcontractor Agreement does not guarantee Subcontractor any work, nor does it imply that Subcontractor has any type of procurement relationship with Contractor or its subsidiaries, either now or in the future.

## Article 4 – PROGRESS AND COMPLETION

Unless herein otherwise specifically provided Subcontractor shall commence work promptly or upon notice from Contractor. Subcontractor shall, in any event, prosecute the work diligently and so as to avoid delaying the progress of Contractor or other Subcontractors on other portions of the project work. Subcontractor shall keep and maintain on the project a sufficient number of properly qualified workmen and a sufficient quantity of materials, equipment and supplies to efficiently perform the work as required without delay. Should Subcontractor cause delay in the progress or completion of the project, the damages resulting therefrom, including liquidated damages assessed by the Owner and attributable thereto, shall be the obligation of the Subcontractor. Contractor shall not be liable to Subcontractor for any delay resulting from the act, neglect or default of the Owner or from causes beyond Contractor's control or, in any case, beyond the granting of justifiable time extensions on written applications, therefor made within 48 hours from the beginning of the claimed delay.

## Article 5 – PAYMENT APPLICATION AND PAYMENT

a.      For each progress payment period, the Subcontractor shall submit its progress payment application to the Contractor for the subcontract work performed to date.
b.      Progress payments to the Subcontractor for satisfactory performance of the work shall be made within Fourteen (14) calendar days after receipt by the Contractor of payment from the Owner for the work. Contractor shall retain 10% of each progress payment requested and approved by the Contractor. Subcontractor agrees to provide to Contractor at the time of each progress payment, partial waivers of lien from all subcontractors, laborers, mechanics, and/or materialmen working under the Subcontractor for

1

Accepted: Subcontractor initial _PPB_

services or materials supplied to date, and a partial waiver of lien from the Subcontractor for any services performed to date.

c.        Final payment shall be made upon completion and acceptance of the work by the Owner and payment for same is received by the Contractor.

d.        Payments, partial or final, made to Subcontractor shall not constitute acceptance of the work nor preclude any claims by Contractor for defective work on the part of the Subcontractor.

e.        The Contractor has at all times the right to either make a direct payment or joint check payment, at Contractor's sole discretion to any of Subcontractor's subcontractors, materialmen, laborers or suppliers, and to deduct such amounts from Subcontractor's balance.

f.        All Subcontractor payment applications should include a schedule of values specific to the project, a job number and a detailed location of work performed.

**Article 6 – INSURANCE**

Subcontractor is to secure, pay for, and file with the Contractor, prior to commencing any work with the Contractor, all certificates for Workers' Compensation, Commercial General Liability insurance, and such other insurance coverage as may be required by specifications and addenda thereto, in at least the following amounts with the specification amounts to prevail if greater than the minimum amounts indicated. The Certificate of Insurance should list TTS, LLC and Tennessee Technical Services,74 Pine Lake Rd. Summertown, TN 38483 as the Certificate Holder and be valid for any and all projects with ElectriCom, LLC. Job specific certificates may be requested if specific contract terms require additional added insured or certificate holders. If these are required, Subcontractor will be notified. Notwithstanding any other provision of the Subcontract, the Subcontractor shall provide the minimum limits of liability coverage as follows:

| **Commercial Automobile Liability** | $1,000,000 | Combined Single Limit including any auto, all owned autos, hired autos and non-hired autos |
|---|---|---|
| | | |
| **Commercial General Liability** | $2,000,000 | General Aggregate (per project) |
| | $2,000,000 | Products-Com/OP AGG |
| | $1,000,000 | Personal & Advertising Injury |
| | $1,000,000 | Each Occurrence |
| | | |
| **Commercial Umbrella Coverage** | $2,000,000 | Each Occurence |

Subcontractor shall furnish an original Certificate of Insurance providing coverage to Contractor and Owner named as additional insured on a primary and non-contributory basis, including a waiver of subrogation clause in favor of Contractor on their general liability policy.

Notwithstanding any other provision of the Subcontract, the Subcontractor shall maintain complete workers' compensation coverage for each and every employee, principal, officer, representative or agent of the Subcontractor who is performing any labor, services, or material under the Subcontract. Further, Subcontractor shall additionally maintain the following minimum limits of coverage, **including a waiver of subrogation clause in favor of Contractor**:

| **Workers Compensation** | $1,000,000 | Bodily Injury Each Accident |
|---|---|---|
| | $1,000,000 | Bodily Injury by Disease Each Employee |
| | $1,000,000 | Bodily Injury by Disease Policy Limit |

Subcontractor shall provide the Contractor with a Certificate of Insurance verifying compliance with the workman's compensation coverage as set forth herein and shall provide as often as required by the Contractor such certification which shall also show the insurance company, policy number, effective and expiration date, and the limits of workman's compensation coverage under each policy.

2

Accepted: Subcontractor initial *PPB*

Professional liability (if any professional services are rendered such as design, engineering, etc.) in an amount of at least $1,000,000 combined single limit.

## Article 7 – COMPLIANCE

Subcontractor agrees to adequately and properly protect the work called for herein and to so perform the work and to so keep and maintain the premises on which such work is being done as to avoid injury or damages to persons or property for which Contractor may be held liable on a claim for damages. Subcontractor shall also assume as to the subcontract work and as to the premises on which such work is being done the obligation to comply with all Federal, State and Local laws, rules and regulations and directives (hereinafter collectively referred to as "laws"). Subcontractor shall fully indemnify and save harmless Contractor from all such claims for damages and also from all penalties, sanctions and other liabilities based on a violation of said laws, and also from all expenses and attorney's fees incident thereto, arising out of or in any way connected with the subcontract work or the premises on which such work is being done, except that this indemnification shall not apply where liability is by law imposed exclusively because of the sole negligence or fault of the Contractor. Subcontractor agrees to pay for all fees, taxes, licenses, permits and expenses required by such compliance, and also, to the extent that Contractor is or may be held liable therefore, to pay all taxes and contributions imposed or required by any law relating to the employees of Subcontractor and to performance of said work and completion of this subcontract.

## Article 8 – DEFAULT

a.       Should the Subcontractor at any time fail to perform any one or more of the agreements herein contained, or fail to avoid Bankruptcy, Receivership or Attachment, or abandon the work, any such failure or abandonment shall amount to default herein and Contractor may, at Contractor's option, after two (2) days written notice to Subcontractor, provide the labor, materials, equipment and supplies and other items necessary to perform the work and discharge the other obligations assumed by Subcontractor and recover the cost thereof from Subcontractor, and may deduct such cost from any money then due or thereafter to become due to Subcontractor under this subcontract or otherwise, or Contractor, at Contractor's option, may terminate this subcontract and take over the work and complete same or re-let the subcontract, deducting in any case the cost thereof (including a reasonable allowance to Contractor for use of Contractor's equipment based on Contractor's then posted rental rates and a reasonable allowance for overhead expenses) from the payments that would otherwise be due herein. Should such cost of completing or re-letting the work exceed that remaining unpaid herein, then such excess shall be the liability of Subcontractor, payable on demand. In case of any default herein, Contractor may take exclusive possession of any materials and equipment on the project belonging to Subcontractor and use the same in completion of the work, free of all claims for the value of said materials and for the rental or use of said equipment, and free of all claims for depreciation and ordinary wear and tear.

b.       Determination of default made by Contractor on good faith under the belief that a default exists under the terms hereof shall be conclusive of the fact of such default and on the Contractor's right to proceed as herein provided. The liability of Subcontractor herein shall extend to and include the full amount of any and all sums paid and obligations assumed by Contractor on good faith under the belief that such payments or assumptions were necessary or required, whether actually necessary or required or not (1) in completing the work and providing labor, materials, equipment, supplies and other items therefore or re-letting the subcontract, and (2) in settlement, discharge or compromise of any claims, demands, suits and judgments pertaining to or arising out of the subcontract work. A sworn itemized statement thereof or the checks or other evidence of payment shall be prima facie evidence of the fact and extent of Subcontractor's liability.

c.       If, after notice of termination of this Agreement, it is determined for any reason that Subcontractor was not in default, or that is default was excusable, or that Contractor was not entitled to the remedies against Subcontractor provided herein, the Subcontractor's remedies against Contractor shall be the same as and limited to those afforded Subcontractor under Article 8 (e).

3                                               Accepted: Subcontractor initial _PPB_

d.      If at any time the schedule is jeopardized by the Subcontractor's temporary inability, neglect, or refusal to perform the whole or any part of the work of this Subcontract so that the Contractor is forced to perform (or have performed) such work to maintain the schedule, Subcontractor agrees to authorize and pay Contractor's back charges for the Work performed, provided Contractor has notified the Subcontractor by telephone or email (to be followed up by written communication) at least twenty-four (24) hours in advance of Contractor's commencement of the work, during which time the Subcontractor may elect to perform the delinquent work to maintain or restore the schedule. Any unpaid back charges shall be recoverable by Contractor from moneys withheld under the provisions of the Subcontract. The exercise of this provision in lieu of contract termination rests entirely and solely with the Contractor at its option.

e.      Contractor shall have the right to terminate or suspend this Subcontract, in whole or in part, without cause upon seven (7) calendar days written notice to Subcontractor. In the event of such termination or suspension for convenience, Subcontractor's recovery against Contractor shall be limited to that portion of fee earned and approved by Contractor and Owner through the date of termination or suspension, together with any retainage withheld and any costs reasonably incurred by Subcontractor that are directly attributable to the termination or suspension, but Subcontractor, shall not be entitled to any other or further recovery against Contractor, including, but not limited to anticipated fees or profits on work not required to be performed.

## Article 9 – CHANGES AND SUBCONTRACTOR CLAIMS

a)      Contractor shall have the right at any time during the progress of the work to increase or decrease the work. Promptly after being notified of a change, Subcontractor shall submit an itemized estimate of any cost or time increases or savings it foresees as a result of the change. Except in an emergency, endangering life or property, or as expressly set forth herein, no addition or changes to the work shall be made except upon written order of the Contractor and Contractor shall not be liable to the Subcontractor for any increased compensation without such written order.

b)      A "claim" is a demand or assertion made in writing by the Contractor or Subcontractor seeking an adjustment in the Subcontract Price and/or Subcontract Time, an adjustment or interpretation of the Subcontractor terms, or other relief arising under or relating to this Subcontract, including the resolution of any matters in dispute between the Contractor and Subcontractor in connection with the work.

c)      Subcontractor shall make all claims to the Contractor for extra work and extensions of time, for which Owner may be responsible, in the manner provided for in the Subcontract Documents, and in sufficient time for Contractor to comply with the requirements of the Primary Contract Documents for making such claims to the Owner. Subcontractor expressly acknowledges and agrees that it shall receive no damages for delay. Subcontractor's sole remedy, if any, against Contractor will be the right to seek an extension to the Contract Time; provided, however, the granting of any such time extension shall not be a condition precedent to the aforementioned "No Damage for Delay" provision.

## Article 10 – INDEMNTIY

To the fullest extent permitted by law, the Subcontractor expressly agrees to indemnify, defend and hold harmless the Contractor, the project owner, the architect, and the engineer and their respective officers, directors, agents and employees herein call the "indemnitees" from any and all liability for damages, including reasonable attorney's fees and court costs, such legal expenses to include costs incurred in establishing the indemnification and other rights agreed to in this paragraph, to persons or property caused in whole or in part by any act, omission, or default by the Subcontractor or its sub-subcontractors, materialmen, or agents of any tier or their employees, arising out of this Subcontract or its performance, including any such damages caused in whole or in part by any act, omission, or default of any indemnitee, but specifically excluding any claims or, damages against an indemnitee or for statutory violation or punitive damages except and to the extent the statutory violation or punitive damages are caused by or result from the acts or omissions of the Subcontract or its sub-subcontractors, materialmen, or agents of any tier or their employees. Provided however that any claim for indemnification for damages caused in whole or in part by any act, omission or default by indemnitee(s) shall be limited to the amount

4                                            Accepted: Subcontractor initial *PPB*

of Subcontractor's insurance or $1 million per occurrence whichever is greater. The parties acknowledge that the amount of the indemnity required hereunder bears a reasonable commercial relationship to the Subcontract and it is part of the project specifications or the bid documents, if any.

The indemnification obligations under this Subcontract shall not be restricted in any way by any limitation on the amount or type of damages, compensation, or benefits payable by or for the Subcontractor under workers' compensation acts, disability benefits acts, or other employee benefits acts, and shall extend to and include any actions brought by or in the name of any employee of the Subcontractor or of any third party to whom Subcontractor may subcontract a part or all of the Work.

### Article 11 – WORKMEN

Neither Subcontractor nor any of Subcontractor's assigns shall employ or keep any workman whose employment on the work covered by subcontract is objected to by the Owner or by Contractor.

Subcontractor shall not place any employee at Contractor's worksite, nor shall Subcontractor permit any employee to perform any work on behalf of or for the benefit of Contractor, without first ensuring said employee's authorization to lawfully work in the United States.

By execution of this agreement, Subcontractor acknowledges, agrees, and warrants that Subcontractor (1) has complied and shall at all times during the term of this subcontract agreement comply in all respects with the Immigration Reform and Control Act of 1986 as amended, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 as amended, and all of the laws, rules, and regulations relating thereto; (b) has properly maintained and shall at all times during the term of this agreement properly maintain all records required by Immigration and Customs Enforcement (DHS-ICE), including, without limitation, the completion and maintenance of the Form I-9 for each of the subcontractor's employees; and (c) has responded and shall at all times during the term of this agreement respond in a timely fashion to any inspection requests related to such I-9 Forms. Subcontractor shall cause its directors, officers, managers, agents and employees to fully cooperate in all respects with any audit, inquiry, inspection or investigation of subcontractor or any of its employees that my be conducted by DHS-ICE.

Subcontractor acknowledges, agrees and warrants that all subcontractors permitted by it to perform work at Contractor's worksites will be required to agree to these same terms as a condition to be awarded any subcontract for such work.

### Article 12 – ASSIGNMENT OF CONTRACT

Subcontractor shall not assign all or any part of this subcontract nor sublet all or any part of the work provided for herein without the prior written consent of Contractor.

### Article 13 – DISPUTE RESOLUTION

a)      Subcontractor shall make all claims for extras, for extensions of time, and for damages for delay or otherwise, for which Owner may be responsible to Contractor in the amount provided in the Primary Contract, if any, for like claims by Contractor upon Owner, and in sufficient time for Contractor to comply with the requirements of the Primary Contract for making such claim to Owner.

b)      Any claims or disputes which may arise, including adjustments to compensation or to time of completion shall be governed by the terms of the Subcontract Documents. Subcontractor shall be bound by the determination of the Owner or, in the event of an appeal or further action or proceeding by the outcome of same, shall be entitled only to its proportionate share of any net recover, less overhead and profit to Contractor, and less Contractor's expenses and attorneys' fees. Subcontractor hereby waives and releases any and all claims, causes of action and rights to further payments beyond the Subcontract amount, except as Contractor may receive funds or extensions of time from the Owner. Subcontractor shall post whatever security may be required by Contractor to cover costs and expenses, including attorneys' fees, as a condition of Contractor proceeding on Subcontractor's behalf.

c)      Except as otherwise provided in this Subcontract, any dispute concerning a question of fact arising under Subcontract which is not resolved shall be decided by Contractor, who shall reduce his

5                                                      Accepted: Subcontractor initial 𝓟𝓟𝓑

decision to writing and furnish a copy thereof to Subcontractor. Contractor's decision shall be final and conclusive.

d)      In the event Subcontractor is desirous of pursuing an appeal of an adverse final decision rendered by the Owner or his representative, that affects the Subcontractor's interest – and provided the Contractor's interests are unaffected – the Subcontractor agrees to bear the full cost thereof and the sole responsibility for prosecuting such appeal.

e)      Subcontractor shall carry on the Subcontract Work and maintain satisfactory progress while any claim or dispute is being resolved. Subcontractor shall make all claims to Contractor, so Contractor has at least five (5) business days within which to satisfy the time requirements of the Primary Contract.

f)      In the case of any dispute between Subcontractor and Contractor, Subcontractor agrees to be bound to Contractor to the same extent that Contractor is bound to Owner by the terms of the Primary Contract and by any and all decisions or determinations made thereunder by the party or board so authorized in the Primary Contract. Contractor agrees to present to Owner, in Contractor's name, all of the Subcontractor's claims for extras and equitable adjustments whenever Contractor is permitted to do so by the terms of the Primary Contract and to further invoke, on behalf of Subcontractor, those provisions in the Primary Contract for determining disputes. Subcontractor agrees to exhaust the remedies available for breach of contract through Contractor prior to instituting a separate action in any court or in the event that a separate action is instituted prior to the exhaustion of the aforesaid remedies, Subcontractor agrees to stay said action pending the exhaustion of remedies against Owner, Subcontractor also agrees to be bound to Contractor to the same extent Contractor is bound to Owner by the final decision of an arbitration proceeding, board or a court of competent jurisdiction, whether or not Subcontractor is a party to such proceeding. If such dispute is prosecuted or defended by Contractor against Owner under the terms of the Primary Contract or in an arbitration proceeding or a court action, Subcontractor agrees to furnish all documents, statements, witnesses and other information required by Contractor for such purpose and to pay or reimburse Contractor for all expenses and costs, if any, incurred in connection therewith. It is expressly understood that as to any and all materials or services furnished or agreed to be furnished by Subcontractor, and as to any and all damages, if any, incurred by Subcontractor, in connection with this work, Contractor shall never be liable to Subcontractor to any greater extent than Owner is liable to Contractor.

g)      Any dispute concerning the Work of this Subcontract, shall, at the election of the Contractor, be referred to arbitration under the construction industry arbitration rules of the American Arbitration Association. Further, in the event the Prime Contract provides for arbitration of disputes, the following provisions shall apply in addition to the other provisions of this section:

1.  In the event the Prime Contract provides for a joint or multi-party arbitration in which Subcontractor may participate as a party, upon written request by Contractor, Subcontractor agrees to participate in and be bound by such arbitration proceedings conducted under the Prime Contract. If the Prime Contract provides only for arbitration of disputes between the Owner and Contractor, Subcontractor agrees that if it has a claim against Contractor arising out of causes for which the Owner might be responsible its exclusive remedy shall be to pursue any such claim through the Contractor and arbitration with the Owner, and Subcontractor shall be bound by the results of the arbitration.

2.  If Owner makes a claim against Contractor arising out of causes for which Subcontractor might be responsible, then upon written request by and at no expense to Contractor, Subcontractor shall cooperate in the defense and be bound by the results of the arbitration involving the Owner and Contractor with regard to such claims.

## Article 14 – CONFIDENTIALITY

Contractor and Subcontractor acknowledges that while performing its obligations under this agreement and for five (5) years after its expiration or its termination, it may have access to the other party's Confidential Information.  Confidential Information is defined as any information disclosed which is not publicly known or that may have commercial value in the business in which the disclosing party is engaged.  Such Confidential Information includes, but is not limited to, project specifications, pricing information, strategic planning, project results.

6                                                        Accepted: Subcontractor initial _PPB_

With respect to all Confidential Information, the parties agree as follows:
a)  Each party must use the same care to protect the disclosing party's Confidential Information as it uses to protect its own Confidential Information.
b)  Each party and its Representatives will keep the information confidential and will not without the other party's prior written consent, disclose any Confidential Information in any manner whatsoever.
c)  Each party may reveal the Confidential Information to its Representatives (a) who need to know the Information for the purpose of completing a project, (b) who are informed by the party of the confidential nature of the Information and (c) who agree to act in accordance with the terms of this Agreement.  Each party will be responsible for any breach of this Agreement by any of its Representatives.

**Article 15 – NON-COMPETE**
During the term of this agreement and for two (2) years after its expiration or its termination, whichever is longer, Subcontractor agrees that it will not, directly or indirectly, for itself or on behalf of any third parties, solicit customers or engage in any business relationship with Customers to provide deliverables or perform services which are the same or similar to that of Contractor, where the business opportunity or work was first introduced to the Subcontractor with the intent of contracting all or a part of that work to Subcontractor.

**Article 16 – CLEANUP**
Subcontractor agrees to keep the project site clean at all times of debris and waste materials arising out of the work. At the completion of the Work, Subcontractor shall remove all debris and waste materials from and about the project site, as well as all tools, appliances, construction equipment and machinery and surplus materials.
Any existing surface or subsurface improvements, including, but not limited to, rough or finish grading, pavements, curbs, sidewalks, pipes, utilities, footings, structures, trees and shrubbery, not indicated in the Subcontract Documents to be removed or altered, shall be protected by the Subcontractor from damage during the prosecution of the work. Subcontractor shall restore any such improvements so damaged to the condition equal to that existing at the time of the Subcontractor's commencement of the work.

**Article 17 – SAFETY**
Contractor is committed to providing a safe workplace environment for all employees as well as the public. We believe that safety is an integral part of all operations and that the well-being of our employees, Subcontractors' employees and the public is a primary business concern to be managed in conjunction with the quality of our services. Subcontractors are to be familiar with OSHA guidelines and diligently comply with all safety standards as they pertain to the scope of work in the Subcontract Agreement. Subcontractor will be required to submit Written Site-Specific Safety Plan/MSDS's with each specific project. The TTS, LLC safety plan is available to Subcontractor upon request and Subcontractor must meet or exceed Contractor's minimum safety standards.
All incidents and accidents occurring onsite are to be reported to Contractor immediately. Any unsafe conditions that are observed must be corrected or immediately reported to Contractor. Subcontractor is required to annually update Exhibit B, attached hereto.

This Master Subcontractor Agreement is entered into as of the date first written above.

Owner Signature: _Pavel Pop-Buia_____   Date: 09/03/2021_____

7

**Exhibit A**
**Vendor Profile Questions**

Legal Business Name: _Smart Communication Systems, LLC_

Contact Person: _Lindsey Claypool_    Phone: _218-368-8099_

Email Address: _lindsey@smartcommsys.com_

Additional Contact: _Jeff Barger_    Phone: _419-889-3620_

Email Address: _jeff@smartcommsys.com_
*Additional contact is not mandatory, please be advised, if listed, additional contact will have access to financial and payment information.*

Office Phone: _813-325-3267_

Mailing Address: _6417 Grenada Island Ave, Apollo Beach, FL 33572_

|  Street Address | City | State | Zip Code |
| --- | --- | --- | --- |

Federal ID Number: _26-1332236_    DBE Certification: _____ Yes ✓ No

**List the states licensed in and the corresponding contractor/subcontractor license number:**
Florida, California, Arkansas, Georgia

Owner Signature: _Pavel Pop-Buia_    Date: _09/03/2021_

8

**Exhibit B**
**Subcontractor Safety Questions**

Tennessee Technical Services, LLC is committed to safety excellence and in providing a safe and healthful work environment for anyone working on our projects.

1. Subcontractor __✓__ has, _____ does not have more than (10) employees, full or part-time, at any time during the year. (Check One)

2. In the preceding (12) months Subcontractors employees had __0__ (insert number) injuries that required medical attention at a retail clinic, urgent care center or emergency room.

3. In the preceding (12) months has the Subcontractor had any incidents that resulted in an employee fatality, amputation or loss of eye _____ Yes __0__ No (If yes, please answer 3a and 3b)

    a. Was OSHA notified? __n/a__ Yes _____ No

    b. Description of Incident:

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

4. Subcontractor performs and documents all OSHA required safety orientation and safety training for employees. _____ Yes __✓__ No

5. Subcontractor performs new hire and random drug screening for all employees. _____ Yes __✓__ No

6. Subcontractor performs background checks for all new employees. _____ Yes __✓__ No

Owner Signature: _Pavel Pop-Buia_____ Date: __09/03/2021__

9

**Exhibit C**
**Subcontractor Direct Deposit (ACH)**
**Enrollment Form and Agreement**

Completed form can be mailed, faxed or emailed as follows:

Tennessee Technical Services, LLC
Attn: Accounts Payable Department
74 Pine Lake Rd
Summertown, TN 38483
Phone: (931) 722-0529
Email: ruddle.tts@hotmail.com

Company/Payee Name:    Smart Communication Systems, LLC

Address:   6417 Grenada Island Ave, Apollo Beach, FL 33572

Remittance Contact Person:   Lindsey Claypool

Remittance Contact Phone:   218-368-8099

Remittance Contact Email:   lindsey@smartcommsys.com

Name of Bank:  Bank of America

ABA/Routing Number:   063100277

Bank Account Number:  229008756629

Type of Account (check one):  __✓__ Checking _____ Savings

I hereby authorize TTS, LLC to automatically deposit payments to the account listed above under the terms and conditions of this Direct Deposit (ACH) Enrollment Form and Agreement.  I certify that I am authorized to enter into this agreement on behalf of the account holder.

I hereby authorize TTS, LLC to release payment information regarding the above listed company to the Remittance Contact Person listed on this form.

Owner Signature: _____*Pavel Pop-Buia*_____    Date: __09/03/2021__

10